UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MATTHEW BRYAN CANIFF,

      Petitioner,

vs.                               Case No.  3:21-cv-356-BJD-LLL
                                                3:16-cr-60-BJD-LLL

UNITED STATES OF AMERICA,

      Respondent.

_____

# ORDER

## I. INTRODUCTION

Petitioner, Matthew Bryan Caniff, a federal inmate, is proceeding through counsel on a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 (Civ. Doc. 1, Crim. Doc. 125).[1] On January 25, 2017,  a jury convicted Petitioner on three counts as charged in a superseding indictment: (1) attempted online enticement of a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b); (2) soliciting child pornography via the internet in violation of 18 U.S.C. § 2251(d)(1)(A), (2)(B), and (e); and (3)

---

[1] Citations to the record in the civil case will be denoted, "Civ. Doc. __," and citations to the record in the criminal case will be denoted, "Crim. Doc. __."

attempted production of child pornography via the internet in violation of 18 U.S.C. § 2251(a) and (e). *See* Crim. Doc. 66. On appeal, the Eleventh Circuit reversed the conviction under 18 U.S.C. § 2251(d)(1) (count two) but affirmed the convictions on the other counts. *See* Crim. Doc. 123 at 2. *See also United States v. Caniff*, 955 F.3d 1183 (11th Cir. 2020). The Court entered an amended judgment on June 26, 2020. *See* Crim. Doc. 111.

In moving to vacate his judgment and sentence on counts one and three, Petitioner raises six grounds of ineffective assistance of counsel. *See* Civ. Doc. 1 at 6–11. The United States has responded in opposition (Civ. Doc. 5), conceding Petitioner timely filed his motion and, except for ground six, raises issues cognizable under § 2255. *See* Civ. Doc. 5 at 7–8. Petitioner, through counsel, filed a reply (Civ. Doc. 15, Crim. Doc. 131).

Under § 2255 and Rule 8(a) of the Rules Governing § 2255 Proceedings,[2] and in accordance with Petitioner's request, *see* Civ. Doc. 15 at 8, the Court has considered the need for an evidentiary hearing and determines that a hearing is unnecessary. *See Rosin v. United States*, 786 F.3d 873, 877 (11th Cir. 2015) ("The district court is not required to grant a petitioner an evidentiary hearing if the § 2255 motion 'and the files and records of the case conclusively show

---

[2] Rule 8(a) of the Rules Governing § 2255 Proceedings expressly requires the Court to review the record, including any transcripts and submitted materials to determine whether an evidentiary hearing is warranted before resolving a § 2255 motion.

that the prisoner is entitled to no relief.'"). *See also Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (holding that a § 2255 movant is not entitled to a hearing "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible"). Thus, the motion is ripe for review.

## II. BACKGROUND

### A. Trial

Petitioner's arrest and prosecution stemmed from an undercover operation by the St. Johns County Sheriff's Office in tandem with the FBI to identify "individuals who had [a] sexual interest in children and . . . wanted to . . . meet[] an actual child" for a sexual purpose. *See* Crim. Doc. 79 at 20. Special Agent Abbigail Beccaccio with the FBI testified that she posed as a 13-year-old girl named "Mandy," and, in accordance with that persona, communicated with Petitioner between March 31, 2016, and April 1, 2016, first through a mobile application called "Whisper" and then through text messages. *Id.* at 27–28, 31–35, 37. Agent Beccaccio testified that Whisper certifies its users must be at least 13 years old, and users between the ages of 13 and 18 must be supervised by an adult. *Id.* at 35–36. As such, "children are legally allowed to be on the application or website." *Id.* at 36.

Through Agent Beccaccio, the Government introduced into evidence all

communications between Petitioner and Mandy, including those that occurred through the Whisper application. *Id.* at 42–44, 47. Posing as Mandy, Agent Beccaccio posted on Whisper a photograph of what appeared to be a young girl who was looking for something to do during Spring Break. *Id.* at 37, 39. The picture was not of Agent Beccaccio but rather of an intern working for the FBI at the time. *Id.* at 37. The photo had been "age-regressed," so the woman appeared "more childlike and youthful." *Id.* at 38. The photo bore the message, "Spring break! And I'm BORED!!!!!!" *Id.* at 39. A man who called himself "the bass" on Whisper and was later identified as Petitioner, responded to the post, saying, "Let's do something then," with a "winky smiley face." *Id.* at 41.

After some initial conversation through the Whisper application, during which Mandy disclosed that she was "not old enough to [drive]," and Petitioner told Mandy he wanted to see her in a bikini, the two began communicating via text messages. *Id.* at 43–44. Through those text messages, Mandy said multiple times that she was 13 or referenced her young age and sexual inexperience. *Id.* at 51, 52, 53, 61, 65, 67, 69, 70. In fact, Mandy disclosed her age immediately during the text conversation and asked Petitioner how old he was. *Id.* at 51. Petitioner replied, "I'm older than you, LOL, obviously," and then said, "I don't think you're too young, LOL." *Id.* Mandy asked him a second time how old he was, and he only responded, "I'm old enough to drive. … [A]nd

4

I can drink." *Id.* at 53. He never disclosed his age. *See id.*

Early in the text conversation, Petitioner told Mandy, "I've been so turned on all day, like a raging hard-on." *Id.* at 52. Mandy responded that she did not know what that meant, saying, "I don't know that much." *Id.* Petitioner told her she could ask him "about anything," and she asked if she could "get in trouble." *Id.* at 53. In response, Petitioner said, "Trouble for what?" to which Mandy reiterated that she was only 13. *Id.* Petitioner replied, "The only one of us that could get in trouble would be me." *Id.*

Petitioner told Mandy that he wanted her to "talk dirty" to him and said he would do the same, "but only if [she were to] start." *Id.* at 54. Petitioner assured Mandy that he was not "a faker" and that anything he said to her while "talking dirty," he would be willing to do. *Id.* at 55. When Mandy suggested to Petitioner a second time that he might be a "faker," he responded, "I'm touching my hard-on" and sent Mandy a picture of a penis. *Id.* at 55–56. He asked Mandy to reciprocate by sending him "a sexy pic" of herself, such as of her breasts or buttocks. *Id.* at 57. Mandy did not immediately respond, prompting Petitioner to ask what she was doing. *Id.* at 58. Mandy responded that her dad had called "to check on [her]," and then she told Petitioner she had ordered pizza and asked if he wanted some. *Id.* at 58–59. He told her he would be willing to drive from Gainesville to St. Augustine "for pizza and a

chance to see some boobies." *Id.* at 59. Petitioner's messages thereafter became more explicit, with Petitioner telling Mandy he wanted her "to play with [his] hard-on," and asking if she had had sex before. *Id.* at 60. She replied that she was a virgin. *Id.* at 61.

Petitioner again asked Mandy to send him a "sexy" picture. *Id.* at 62. Mandy sent Petitioner a photo, which Agent Beccaccio testified was of the same FBI intern depicted in the photo posted on the Whisper application. *Id.* at 63. Like the first photo, the second had been age-regressed and was not sexually explicit. *Id.* Petitioner commented that Mandy did not look 13. *Id.* He then told her what he wanted to do to her sexually, with explicit references to genitalia. *Id.* at 64. Petitioner sent Mandy two more pictures of what he claimed were his penis, and he encouraged her to touch herself. *Id.* at 65, 67. After more sexually explicit text messages were exchanged, Petitioner and Mandy arranged to meet at a gas station near Mandy's "home" in St. Augustine, with Petitioner driving from Gainesville and Mandy planning to ride her bike to meet him. *Id.* at 68–71. Petitioner first asked Mandy to confirm she was not a cop, and she responded, "Like 13-year-olds are cops," and then more directly said, "I'm not a freaking cop." *Id.* at 69.

Petitioner had car trouble on his way to St. Augustine and reported to Mandy that he would be unable to meet her. *Id.* at 72. She asked for a picture

to prove he was not joking, so Petitioner sent a picture of his car with the hood up. *Id.* at 74. Petitioner asked Mandy to send him a picture of herself wearing the clothes she said she would be wearing when he arrived—a hoodie and Superman pants. *Id.* at 75. She did so, although, as before, the person pictured was the "undercover persona child" depicted in the other photos. *Id.* Agent Beccaccio clarified the photo was "not pornographic in nature." *Id.* at 76.

The tow truck driver, unexpectedly, was able to fix Petitioner's car, so he relayed to Mandy that he was back in route and told her when she should start riding her bike to the gas station. *Id.* at 77, 79. Mandy feigned having bike issues, preventing her from meeting Petitioner at the gas station, and she gave him her "home" address instead. *Id.* at 80. Petitioner arrived at the house at about 1:27 a.m. on April 1, 2016. *Id.* at 81. Officers had followed Petitioner from the original meeting spot (the gas station) to the house, where events were captured on video. *Id.* at 82, 86–87. When Petitioner parked his car in the driveway, the FBI intern who posed as Mandy in the photos appeared at the doorway in a hoodie and Superman pants and waved to Petitioner, motioning for him to come inside. *Id.* at 93. At the doorway, Petitioner was arrested. *Id.* at 94.

On cross-examination, defense counsel questioned Agent Beccaccio extensively about the words and phrases she used and the overall tone of her

text messages to Petitioner, suggesting that "Mandy" did not communicate like a typical "virginal and naïve" 13-year-old girl, but rather sounded like an adult role-playing a young girl. *Id.* at 113–24. Defense counsel elicited the following testimony from Agent Beccaccio: the pictures of "Mandy" that were sent to Petitioner depicted the FBI intern, who was in her mid-twenties when the photos were taken, *id.* at 104, 126; college students and teachers—not just kids—have off during spring break, *id.* at 104–05; Petitioner told officers immediately after his arrest that he believed he was communicating with an adult who was merely "role-playing" a 13-year-old girl, *id.* at 106–07; direct or indirect references to Mandy's age were made nearly twenty times over the course of the text conversation, *id.* at 108–09; the "screen name" or "username" the Whisper application assigned to Mandy's profile was "a dangerous visual," which would not necessarily have aligned with a "13-year-old girl . . . pretending to be kind of virginal and naïve," *id.* at 109–10; and after Petitioner viewed the photo Mandy texted him (of the twenty-something FBI intern), he commented that she did not look 13, *id.* at 126.

With respect to Petitioner's "role-playing" defense, defense counsel asked Agent Beccaccio specifically about "role-playing" on dating sites or chat rooms:

> Q. You would agree that it's a fair statement when I say when people are talking on chat rooms or in a chat situation like this, you don't really know who you're talking to, right?

> A. People frequently, as in many reactive cases that I've investigated, portray people to be -- that they're not.
>
> Q. Say it again.
>
> A. I've seen this. Definitely that happens, yes, ma'am.
>
> Q. Okay. I mean, they even have a TV show called catfishing [verbatim] where you go on these dates -- you never heard of Catfish?
>
> A. I'm familiar with the term in terms of communication, text lingo, but I've never seen the show or heard of it.
>
> Q. Okay. But that's when somebody's not portraying who they really are on these dating sites or on text messaging, correct?
>
> A. Certainly.
>
> Q. People find out they're talking to 80-year-old men when they think they're talking to a young woman, right?
>
> A. Sure.

*Id.* at 130–31. Defense counsel asked Agent Beccaccio to confirm that investigators involved in the investigation knew detailed information about Petitioner, such as his gender, age, address, driver's license number, phone number, and social security number, but Petitioner had no way of knowing the same about the person with whom he was chatting. *Id.* at 131.

> A. I would agree that [Petitioner] was under the impression he was speaking with a 13-year-old child.
>
> Q. That's what you think, right?

9

A. That was my persona that I portrayed, yes, ma'am.

Q. Okay. And he very clearly had said a number of times that that's not what his belief was, correct?

A. I believe there were post-arrest statements, that he believed someone -- there was someone here in this house with whom he wanted to have sex.

Q. Okay. And he believed that he was role-playing with an adult female, correct?

A. I believe he did make that statement in his post-arrest statement, yes, ma'am.

Q. So [Petitioner], because he didn't know who he was actually talking to, it could have been a 13-year-old girl, right?

A. It very easily could have been an actual child.

Q. Could have been a police officer, right?

A. Yes, ma'am.

Q. Could have an been old man, right?

A. Yes.

Q. Could have been a prostitute, right?

A. I suppose, yes, ma'am.

*Id.* at 131–32. In accordance with the suggestion that Petitioner possibly thought he was chatting with a prostitute, defense counsel asked Agent Beccaccio a series of questions along those lines, including noting that Petitioner told Mandy *he* was not a cop and included a dollar sign emoji in one of his responses. *Id.* at 138–41. Agent Beccaccio did not agree that the dollar

10

sign emoji suggested Petitioner thought he was chatting with a prostitute. *Id.* at 141.[3]

Defense counsel also questioned Agent Beccaccio about the appearance of the FBI agent who stood in the doorway of "Mandy's" home when Petitioner arrived: "So there's a 27-, 28-year-old woman waving at [Petitioner], telling him to come into the house, right?" *Id.* at 142. Agent Beccaccio answered, "Yes, ma'am," and agreed that the FBI "can't use age regression on a human being." *Id.* Defense counsel asked Agent Beccaccio to confirm that Petitioner was arrested immediately when he reached the door, before he said anything, such as "[W]here's the 13-year-old girl?" or "Hurray, it's a grown woman like I thought," or "How much is this going to cost me?" *Id.* at 144–45. Finally, counsel asked Agent Beccaccio to confirm that "no child pornography was found on [Petitioner's] phone" when it was searched incident to his arrest. *Id.* at 145.

St. Johns County Sheriff's Office Detective Kevin Greene also participated in the operation and testified at trial. *Id.* at 186–89. Detective Greene assisted another detective, Bray Taylor, with the post-arrest interview of Petitioner. *Id.* at 192. The video of the interview was played for the jury, and the transcript of the interview was entered into evidence. *Id.* at 200; Crim. Doc.

---

[3] On re-direct, Agent Beccaccio testified that Petitioner had "two single one dollar bills" in his wallet when he was arrested. *See* Crim. Doc. 79 at 158.

80 at 6. *See also* Gov't Exs. 27, 27A. In his post-arrest interview, Petitioner told detectives that, because he thought the Whisper application required users to be at least 17 or 18, he assumed the person with whom he was communicating was at least that age, perhaps older. *See* Crim. Doc. 80 at 18.

Detective Greene agreed with defense counsel that "during the whole process of the interview, [Petitioner] never backed off his statement that he believed he was talking to an adult." *Id.* Additionally, defense counsel questioned Detective Greene extensively about Petitioner's immediate cooperation in the investigation, highlighting that Petitioner consented to the search of his car and phone; provided his email address and passwords for various accounts accessed through his phone, including Facebook and Snapchat; and signed "a consent to assume online identity," which permitted investigators to assume Petitioner's persona in online chat forums. *Id.* at 19–22. Defense counsel also asked Detective Greene to corroborate that Petitioner had no child pornography on his phone. *Id.* at 23. The following exchange occurred:

> Q.   [Y]ou talked about the photographs that you found in [Petitioner's] phone of -- photographs of penises, correct?
>
> A.   Yes, ma'am.
>
> Q.   And that -- you indicated you saw the text messaging that [Petitioner] had sent between him[self] and Agent Beccaccio, right?

A.     Yes, ma'am.

Q.     Okay. Other than that, there was nothing else in the phone of any evidentiary value, correct?

A.     In reference to this case, no, -- or, I mean --

Q.     In reference to anything.

A.     -- any other case that I knew of, yes.

Q.     There was no other illegal activity -- even if that's illegal activity, there was no illegal activity in the phone, correct?

A.     Correct.

Q.     Okay. There was no child pornography in his phone, correct?

A.     Correct.

Q.     There were no chats in his phone that were inappropriate or illegal, correct?

A.     Correct.

Q.     Okay. The only thing found in his phone was adult pornography, correct?

A.     To the best of my knowledge, yes.

Q.     Okay. And nothing illegal with what he had, correct?

A.     Correct.

Q.     And, in fact, no children ever came forward after this investigation indicating that they had ever received any inappropriate contact with [Petitioner], correct?

A.     Correct.

13

> Q.     [Petitioner] said to you, "If I had gotten here and, I mean . . . it doesn't mean much now, but had I gotten here and she was clearly under 18, I would have just left."
>
> He told you that, correct?
>
> A.     Yes, to Detective Taylor.

*Id.* at 22–24.

In response to this exchange, the prosecutor asked Detective Greene on re-direct whether the text messages themselves were "evidence of illegal activity." *Id.* at 25. Defense counsel objected, but the Court overruled the objection, and Detective Greene responded that he "assumed" the text messages were evidence of illegal activity given the testimony he was called to offer at trial but clarified that he "found nothing else . . . apparently illegal in the phone." *Id.* at 25–26. Detective Greene testified that, based on his experience and training, it was his opinion that the text messages and pictures of Petitioner's penis were "evidence of illegal activity." *Id.* at 26.

At the close of the Government's case, defense counsel moved for a judgment of acquittal, arguing that there was no evidence regarding Petitioner's state of mind sufficient to prove that he believed the individual with whom he was communicating was under 18 (or 16, per Florida law), and there was insufficient evidence showing Petitioner took a "substantial step towards committing [an] attempt" to persuade, entice, or coerce a minor to

14

engage in sexual activity. *Id.* at 28–29, 31. The Court denied the motion, finding "there [was] sufficient evidence for [the] case to be submitted to the jury." *Id.* at 40.

### B. Direct Appeal

In affirming Petitioner's convictions on counts one and three, the Eleventh Circuit held there was "sufficient evidence for a jury to find that [Petitioner] believed Mandy was thirteen," despite his post-arrest assertion that Mandy was an adult "role-playing" a child. *Caniff*, 955 F.3d at 1193. The Court reasoned, not only did Mandy say "several times" that she was 13, but,

> a jury could find that many of Mandy's text messages suggested that she was thirteen—being on spring break, not being old enough to drive, and being sexually inexperienced. Furthermore, there was nothing in their text messages that expressly or even inferentially suggested that Mandy was an adult or that either [Petitioner] or Mandy were only role playing.

*Id.* at 1193–94 (citing *United States v. Rutgerson*, 822 F.3d 1223, 1228–30 (11th Cir. 2016); *United States v. Yost*, 479 F.3d 815, 819 (11th Cir. 2007)). Additionally, the court explained that § 2251(a) prohibits not only soliciting minors for sex but "ask[ing] for nude photos" from one believed to be a minor. *Id.* at 1192 (citing cases). The court noted that the Government can separately charge a person for soliciting a nude photo of a minor and for receiving such a photo. *Id.*

15

### III. STANDARD OF REVIEW

Under Title 28, United States Code, § 2255, a person in federal custody may move to vacate, set aside, or correct his sentence on one of four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). In short, only jurisdictional claims, constitutional claims, and claims of error that are so fundamentally defective as to cause a complete miscarriage of justice will warrant relief through collateral attack. *United States v. Addonizio*, 442 U.S. 178, 184–86 (1979). The movant "bears the burden to prove the claims in his § 2255 motion." *Rivers v. United States*, 777 F.3d 1306, 1316 (11th Cir. 2015). *See also Beeman v. United States*, 871 F.3d 1215, 1221 (11th Cir. 2017).

The United States Constitution provides criminal defendants the right to the effective assistance of counsel. U.S. Const., amend. VI. As such, a claim that a criminal defendant has received the ineffective assistance of counsel in violation of the Sixth Amendment may properly be brought in a collateral proceeding under § 2255. *Massaro v. United States*, 538 U.S. 500, 504 (2003). To establish the ineffective assistance of counsel, a petitioner must satisfy two prongs: (1) that his counsel's conduct amounted to constitutionally deficient

16

performance; and (2) that counsel's deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Martin v. United States*, 949 F.3d 662, 667 (11th Cir. 2020).

In assessing the "performance" prong, courts adhere to the standard of reasonably effective assistance. *Weeks v. Jones*, 26 F.3d 1030, 1036 (11th Cir. 1994) (citing *Strickland*, 466 U.S. at 688). Under this standard, a review of counsel's performance is highly deferential. *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000). As the Eleventh Circuit has explained:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (quoting *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992)). To establish his attorney was deficient under the highly deferential *Strickland* standard, a petitioner must show that, given all the circumstances, counsel's performance fell "outside the wide range of professionally competent assistance." *Scott v. United States*, 890 F.3d 1239, 1258 (11th Cir. 2018) (quoting *Payne v. Allen*, 539 F.3d 1297, 1315 (11th Cir. 2008)).

To satisfy the "prejudice" prong, a petitioner must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Martin*, 949 F.3d at 667 (citing *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010)). A reasonable probability is one sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. "It is not enough for the defendant to show that the error had some conceivable effect on the outcome of the proceeding." *United States v. Phillips*, 853 F. App'x at 626 (citing *Strickland*, 466 U.S. at 693)).

A court considers the totality of the evidence in its determination of whether a petitioner has met both prongs of the *Strickland* test. *Strickland*, 466 U.S. at 695. If a petitioner makes an insufficient showing on one prong, the district court need not reach the other. *Id.* at 697.

## IV. DISCUSSION

In his six grounds for relief, Petitioner argues his counsel was ineffective in various ways. *See* Civ. Doc. 1 at 6–11. Before addressing each ground, the Court notes that all grounds for relief are conclusory in nature. Petitioner does not argue through citation to binding authority how each of counsel's alleged missteps constitutes "deficient performance" under the "highly deferential" *Strickland* standard, nor does he explain with any specificity how any purported errors prejudiced him. *See Tejada*, 941 F.2d at 1559 (holding a

18

habeas petitioner is not entitled to an evidentiary hearing or habeas relief when his assertions are conclusory). *See also Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) ("Conclusory allegations of ineffective assistance are insufficient." (quoting *United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991))). Moreover, Petitioner primarily challenges his counsel's "strategic and tactical decisions, which cannot be the basis for finding counsel ineffective." *See Tejada*, 941 F.2d at 1559.

## A. Ground One

In his first ground for relief, Petitioner challenges his conviction under 18 U.S.C. § 2251(a) for attempting to produce child pornography, which was count three in the superseding indictment. *See* Civ. Doc. 1 at 5, 7. Petitioner asserts that his trial counsel was ineffective for not arguing to the jury that it was not a violation of the law for Petitioner to "ask" an "adult agent portraying herself as a minor" for sexually explicit images. *Id.* at 6–7. According to Petitioner, there was no evidence that he "employ[ed], use[d], persuade[d], induce[d], entice[d], or coerce[d] any minor to engage in … any sexually explicit conduct for the purpose of *producing* any visual depiction of such conduct," and his counsel was deficient for not arguing as much. *Id.* at 5, 7 (emphasis in original). The Government counters that Petitioner's argument incorrectly reflects the crime with which he was charged and the relevant legal principles.

19

*See* Civ. Doc. 5 at 11–12.

Indeed, Petitioner's argument is directly refuted by the record and applicable law. Petitioner was charged with "attempting" to produce child pornography. *See* Crim. Doc. 35 at 2–3. The Court instructed the jury what the Government had to prove on this charge:

> First, [Petitioner] *attempted* to employ, use, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct;
>
> . . . [S]econd, that [Petitioner] did so for the purpose of producing a visual depiction of such conduct;
>
> Third, that [Petitioner] knew or had reason to know that such visual depiction would have been transported or transmitted using a facility of interstate commerce;
>
> Fourth, that [Petitioner] engaged in conduct which constituted a substantial step toward the commission of the crime and which strongly corroborates [his] criminal intent; and
>
> Fifth, that [Petitioner] acted knowingly and willfully.
>
> . . . .
>
> [T]he term "minor" includes any person who is less than 18 years old, as well as any person who [Petitioner] *believed* to be an actual person less than 18 years old.

Crim. Doc. 80 at 135–36 (emphasis added).

20

Contrary to Petitioner's contention, the Government did not have to prove "that there was any physical production or distribution of any image," *see* Civ. Doc. 1 at 6, or that "he took any photographic images of any minor child," *see* Civ. Doc. 15 at 3. Additionally, a conviction under § 2251(a) does not require an actual minor victim. *See United States v. Lee*, 603 F.3d 904, 912–13 (11th Cir. 2010) (rejecting the appellant's argument that "he could not have violated either section 2422(b) or section 2251(a) and (e) because he communicated with an adult intermediary" about fictitious minor girls). *See also Yost*, 479 F.3d at 819 (explaining that, to sustain a conviction for attempt under the child pornography statutes, including § 2251(a), "an actual minor is not required").

In accordance with applicable law, defense counsel began the closing argument by reminding the jury what Petitioner told detectives during his post-arrest interview: "I thought she was role-playing. I thought she was an adult." *See* Crim. Doc. 80 at 75. Counsel repeated the quote again later and argued, "The law doesn't punish people for engaging in fantasy or role-playing games, even when they use vulgar language, even when they say uncomfortable things, things that . . . two adults talking to each other wouldn't find necessarily uncomfortable." *Id.* at 77, 79. Counsel continued:

> Regardless of what the special agent said to
> [Petitioner] throughout [the text conversation], unless

21

> those statements created in him – no matter the
> number of times she said it [that Mandy was 13],
> unless those statements created in him a belief that
> the person he was dealing with was under 18 and that
> he then knowingly and willfully continued with that
> behavior, then *there is no crime*.

*Id.* at 80 (emphasis added). Defense counsel repeatedly articulated the theory of Petitioner's defense—in the opening statement, through cross-examination, and in the closing argument—that Petitioner believed he was communicating with an adult who was merely "role-playing." *See* Crim. Doc. 79 at 23–24, 104, 106–07, 126, 130–32, 145; Crim. Doc. 80 at 75, 77–80.[4]

As demonstrated by its verdict, the jury did not find Petitioner's role-playing defense credible. The evidence adduced at trial showed Petitioner engaged in online conversations with Mandy, a girl the jury reasonably concluded based on the evidence that Petitioner believed was only 13 years old. Using a cellular phone, Petitioner sent Mandy pictures of his penis and asked for "sexy" pictures in return, including of her genitalia, of Mandy pleasuring herself, of Mandy in the shower, and of Mandy in a bikini. *See* Crim. Doc. 79 at 52, 56, 57, 62, 65, 67, 72. *See also* Gov't Ex. 3 at 1, 5, 9, 12, 16. As such, there was sufficient evidence upon which the jury could find Petitioner "*attempted* to

---

[4] During a sidebar conversation had when Agent Beccaccio was on the stand, the Court observed that "the question of role-playing was appropriately addressed on direct [of Agent Beccaccio] and sufficiently addressed on redirect." *See* Crim. Doc. 79 at 161.

employ, use, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct . . . for the purpose of producing a visual depiction of such conduct." *See* Crim. Doc. 80 at 135 (emphasis added).

Petitioner fails to demonstrate his counsel was deficient. Even assuming *arguendo* that a different attorney may have been more persuasive or could have made a different argument or highlighted different evidence or testimony, the *Strickland* standard does not demand defendants receive the best possible defense. *See Waters*, 46 F.3d at 1512. *See also Chandler*, 218 F.3d at 1313 ("To state the obvious … trial lawyers, in every case, could have done something more or something different."). Regardless, Petitioner does not demonstrate a reasonable probability that the result of the proceeding would have been different but for counsel's purported deficiency. Accordingly, Petitioner is not entitled to relief on Ground One.

## B. Ground Two

In his second ground for relief, Petitioner asserts "counsel was ineffective for not objecting to an aged [sic] regressed photograph of an adult when there was no evidence presented that the photograph utilized was a thirteen-year-old girl." *See* Civ. Doc. 1 at 7–8. Petitioner suggests the Government did not lay a proper foundation before introducing the age-regressed photos because no witness testified to the specific methods or tools used to make the woman

23

depicted in the photos (the FBI intern) look younger than her actual age (mid-twenties). *Id.* at 8. *See also* Civ. Doc. 15 at 4. Additionally, Petitioner argues it was error for counsel not to call an expert witness to testify "whether a reasonable person would have believed [the person in the photos was] a child as opposed to a young-looking woman sixteen years of age or older." *See* Civ. Doc. 1 at 8. Finally, Petitioner contends counsel was ineffective for failing to introduce the original, non-age-regressed photos into evidence for comparison. *Id.*

The Government counters that an objection to the age-regressed photos would have been overruled because those photos were relevant, material, and probative given Petitioner viewed them when communicating with Mandy. *See* Civ. Doc. 5 at 12. The Government further argues the original photos of the FBI intern—before they were age-regressed—would have been inadmissible because Petitioner saw only the age-regressed photos when communicating with Mandy, and testimony of what a reasonable person may have believed when viewing the photos was irrelevant to the crimes charged. *Id.* at 12–13.

The Court finds the Government's arguments convincing. Any objection to the admissibility of the photos likely would have been overruled because the photos Petitioner viewed on the night in question were relevant to the Government's case-in-chief. And the Government had to prove what

24

Petitioner—not a reasonable person—"believed" Mandy's age to be under all the circumstances. *See* Crim. Doc. 80 at 136. Furthermore, there was no dispute the photos in which Mandy's face was shown had been age-regressed to align with the fictional narrative that a 13-year-old girl was bored during Spring Break and interested in meeting up with a man. *See* Crim. Doc. 79 at 35, 37–38, 63, 102, 126. And contrary to Petitioner's contention, defense counsel did in fact elicit some testimony regarding the specific techniques applied to achieve a younger-looking appearance of the FBI intern depicted in the photos:

> Q. On direct when you were describing the age regression, you talked about adding braces or removing the breast development. Do you know what was done on this picture?
>
> A. Not specifically, no.
>
> Q. Do you know if there were any changes to her facial features?
>
> A. Yes, there were. I know at a bare minimum, I believe, under her eyes was done and the softening of the skin on her face.
>
> Q. And this is something you think from looking at the picture or something that was actually told to you?
>
> A. No. Those are things that are done standardly.

*Id.* at 146–47.

Regardless of any explanation of the specific age-regression techniques applied to the photos, as the Eleventh Circuit held, there was "sufficient

evidence for a jury to find that [Petitioner] believed Mandy was thirteen." *See Caniff*, 955 F.3d at 1193. Not only did the jury see the photos Petitioner viewed in the same condition he viewed them, but the jury heard the entire text exchange between Petitioner and Mandy, during which Mandy said multiple times that she was 13, and Petitioner told Mandy that he would have been the only one of the two to get "in trouble." *See* Gov't Exs. 1, 2, 3, 5. The jury also heard Petitioner's post-arrest interview, during which he conceded the girl in the photos looked young, which contradicted the defense theory he ultimately advanced at trial that the girl in the photos and the person who greeted him at the door of Mandy's house in fact appeared to be in her twenties. During his interview, Petitioner said he "thought [the girl pictured] wasn't her [Mandy]," but rather was "an old picture" of the adult with whom he was speaking or was of someone else completely. *See* Gov't Ex. 27A at 24.

Petitioner fails to demonstrate his counsel was ineffective for not asserting meritless objections or inquiring more of the Government witnesses about the methods used to achieve a younger-looking appearance of the woman depicted in the photos sent to Petitioner. He also fails to demonstrate the result of the proceeding would have been different had counsel sought to offer such evidence. To the extent Petitioner is merely challenging the sufficiency of the evidence in this claim, the Eleventh Circuit instructs, "[O]nce a matter has

been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under [§] 2555." *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000). This claim was decided adversely to Petitioner on direct appeal. For the reasons stated, Petitioner is not entitled to relief on Ground Two.

### C. Ground Three

In his third ground for relief, Petitioner asserts his counsel was ineffective for failing to question Agent Beccaccio about the nature and extent of her training for posing as a child and failing to ask Agent Beccaccio and other law enforcement witnesses to explain the "method" law enforcement uses to "determine if the subject of an investigation . . . [is] thirteen instead of sixteen" based solely on the subject's text messages. *See* Civ. Doc. 1 at 9.[5] This claim is exceedingly vague and undeveloped. It appears Petitioner faults his counsel for not affirmatively establishing on cross-examination that the precise age of a teenager cannot be determined through text messages alone. *See id. See also* Civ. Doc. 15 at 5–6. Petitioner's argument ignores that Mandy

---

[5] In the issue heading for ground three, Petitioner contends counsel was ineffective "for not moving in limine to prevent law enforcement from categorizing the language used by [Petitioner] was intended to groom the adult agent who purported to be a minor for sexual activity." *See* Civ. Doc. 1 at 9. The argument that follows, however, does not expound upon the alleged failure to file a motion in limine. Rather, Petitioner criticizes defense counsel's cross-examination of Agent Beccaccio. *Id.*

expressly and immediately disclosed her purported age when communicating with Petitioner by text. *See* Crim. Doc. 79 at 51; Gov't Ex. 3 at 1. The Government did not have to prove what Petitioner believed Mandy's age to be based solely on the language she used.

Moreover, contrary to Petitioner's contention in his § 2255 motion, defense counsel implied at trial that "[t]here is no method to determine if a person using text messaging is thirteen instead of sixteen." *See* Civ. Doc. 1 at 9. Defense counsel vigorously cross-examined Agent Beccaccio about the language she used when conversing with Petitioner, suggesting that the things she said were not consistent with Mandy's proclaimed age of 13. *See* Crim. Doc. 79 at 110 (suggesting the screen name "a dangerous visual" was "weird" for someone trying to establish the "profile of a 13-year-old naïve girl"); *id.* at 111 (suggesting a 13-year-old likely would not admit to being unfamiliar with how to use technology); *id.* at 112–13 (suggesting a 13-year-old would not begin a conversation by disclosing her age unsolicited); *id.* at 130–31 (discussing the concept of "catfishing," which is when a person in a chat room or online conversation is "not portraying who they really are"); *id.* at 131 (suggesting there was no way Petitioner could have known with certainty the age of the person with whom he was communicating based solely on the text messages and pictures exchanged); *id.* at 132 (asking Agent Beccaccio to agree that, given

28

all communications occurred via text messaging, Petitioner could have been communicating with "a police officer," or an "old man," or even a "prostitute"); *id.* at 138–40 (suggesting Petitioner would not have told Mandy he was not a cop if he truly believed he was chatting with a 13-year-old girl as opposed to a woman who was willing to accept money in exchange for sex).

Upon review of the evidence, the Court concludes Petitioner fails to demonstrate his counsel was deficient, or that if she was deficient, any such deficiency prejudiced his defense. Additionally, as with Ground Two, to the extent Petitioner is merely challenging the sufficiency of the evidence in Ground Three, this issue "cannot be re-litigated in a collateral attack under [§] 2555" because the Eleventh Circuit held adversely to him on direct appeal. *See Nyhuis*, 211 F.3d at 1343. Petitioner is not entitled to relief on Ground Three.

### D. Ground Four

In his fourth ground for relief, Petitioner asserts his trial counsel was ineffective for not subpoenaing as a witness the FBI intern whose likeness was used to portray Mandy in the photos sent to Petitioner. *See* Civ. Doc. 1 at 9–10. Petitioner argues the FBI intern who appeared in the doorway at Mandy's house and waved him inside "was clearly not a minor but was clearly an adult," which was consistent with his claimed belief to have been chatting with someone role-playing a minor. *Id.* at 10. He contends that, since the FBI intern

was not called as a witness, the jury was "left to speculate regarding the appearance of th[e] person" who greeted Petitioner when he arrived at the house. *See* Civ. Doc. 15 at 6. The Government notes that defense counsel "deftly cross-examined [Agent] Beccaccio on this point," by showing the jury exactly what the FBI intern looked like when she appeared in the doorway at Mandy's house. *See* Civ. Doc. 5 at 15.

Petitioner's argument is unpersuasive given the record. Defense counsel cross-examined the Government's witnesses in accordance with the defense theory that Petitioner believed he was communicating with a woman who was at least 17 or 18. In particular, counsel highlighted during cross-examination that the photos Petitioner received showed a young woman in her twenties who looked to be in her twenties—or at least older than 13—despite any age-regression techniques applied. *See* Crim. Doc. 79 at 104, 126, 142.

Moreover, to Petitioner's argument that the "person who appeared at the door . . . was clearly not a minor," the jury was shown the woman Petitioner saw that night and, more importantly, how she appeared when he saw her. *See id.* at 93, 142. As such, the jury was not left to "speculate" what Petitioner saw when he pulled up to the house. *See* Civ. Doc. 15 at 6. On direct examination of Agent Beccaccio, the Government introduced video evidence that showed the FBI intern standing in the doorway waving to Petitioner when he arrived at

30

Mandy's house. *See* Crim. Doc. 79 at 93. On cross-examination, defense counsel asked that the video be "freeze-frame[d]" on the FBI intern and asked Agent Beccaccio to confirm the person standing in the doorway was "a 27-, 28-year-old woman." *Id.* at 142. Agent Beccaccio agreed, saying, "Yes, ma'am." *Id.*

What the FBI intern looked like at the time of Petitioner's trial would not have been relevant to what Petitioner saw and believed on the night he was communicating with Mandy, who claimed to have been a 13-year-old girl. Regardless, whether to call a particular witness to testify at trial "is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters*, 46 F.3d at 1512 (citing *Solomon v. Kemp*, 735 F.2d 395, 404 (11th Cir. 1984)). Petitioner fails to demonstrate his counsel was deficient or that any deficiency prejudiced his defense in accordance with the *Strickland* standard. As such, he is not entitled to relief on Ground Four.

## E. Ground Five

In his fifth ground for relief, Petitioner asserts his trial counsel was ineffective for failing to emphasize the role-playing defense. *See* Civ. Doc. 1 at 10. He states, "[l]aw enforcement officers were not questioned regarding [Petitioner's] contention that the entire conversation involved in this matter was him role-playing with a person he believed to be an adult." *Id.*[6] The

---

[6] Petitioner's argument is vague. He suggests that defense counsel should have asked specific questions about how role-playing occurs online and what those

Government responds, "This is flat wrong." *See* Civ. Doc. 5 at 15.

Petitioner's vague and conclusory argument indeed is refuted by the record. Defense counsel referenced and argued the role-playing theory throughout trial, including when cross-examining the Government's witnesses. For instance, on cross, Agent Beccaccio conceded that she (the agent) was "playing the role of a 13-year-old girl" when communicating with Petitioner. *See* Crim. Doc. 79 at 106. The following exchange occurred:

> Q. [The prosecutor] said to this jury in opening statement that you [Agent Beccaccio] were role-playing. You were playing the role of a 13-year-old girl, correct?
>
> A. I believe he used the term "playing the role of a 13-year-old girl.
>
> Q. Okay.
>
> A. Part of our chat in undercover training is we are trained to portray --
>
> Q. Okay. But that's what I mean. You -- what you were doing on Whisper when you were making those exchanges is that you were playing the role of a 13-year-old girl.

---

conversations sound like. *See* Civ. Doc. 1 at 11. However, he does not describe in any detail the kinds of questions that should have been asked or the responses those questions likely would have elicited. Additionally, the argument he advances in his reply is inconsistent with that advanced in his motion. In his motion, Petitioner asserts defense counsel should have questioned the government's law enforcement witnesses about role-playing and how it occurs online. *See id.* at 10–11. In his reply, however, Petitioner suggests defense counsel should have called an expert witness to testify about online role-playing. *See* Civ. Doc. 15 at 7.

> A. I was acting as a 13-year-old child, yes, ma'am.

*Id.* Agent Beccaccio further agreed that Petitioner immediately told detectives "he believed that the person he was talking to was an adult." *Id.* at 107. On re-cross, defense counsel asked Agent Beccaccio, "role-playing exists, correct?" *Id.* at 166. Agent Beccaccio responded, "I'm sure it does, yes, ma'am." *Id.* Defense counsel also questioned Detective Greene about Petitioner's professed belief that he was communicating with an adult.

> Q. [D]uring the whole process of the interview, [Petitioner] never backed off his statement that he believed he was talking to an adult, did he?
>
> A. That's true.
>
> Q. Okay. In fact, he told y'all he believed that she was role-playing with him, correct?
>
> A. Yes, ma'am.

*See* Crim. Doc. 80 at 17. Detective Greene confirmed that Petitioner told detectives he assumed Mandy was at least 17 or 18, despite her claiming to have been 13, because the Whisper application "says that you have to be at least 17 or 18 to download [it]." *Id.* at 17–18. That the jury did not accept Petitioner's role-playing defense does not permit the conclusion that his attorney was deficient. However, even assuming *arguendo* counsel was deficient, Petitioner fails to demonstrate the result of the proceeding would have been different but for any purported deficiency. Petitioner is not entitled

33

to relief on Ground Five.

**F. Ground Six**

In his final ground for relief, Petitioner asserts his trial counsel was ineffective for asking Detective Greene to confirm that, outside of the text messages and explicit photos Petitioner sent to Mandy, "there was nothing else [found during the search of his cell] phone of any evidentiary value" or of "illegal activity." *See* Civ. Doc. 1 at 11–12. According to Petitioner, this line of questioning "opened the door" for the Government, on re-direct, to elicit Detective Greene's opinion that the text messages themselves were evidence of a crime. *Id.* at 12. Petitioner claims that had defense counsel "not asked [Detective Greene] general, open ended questions, damaging evidence regarding the illicit nature [of] the text messages on [Petitioner's] phone would not have been presented to the jury." *Id.*

The Government argues this issue is not cognizable under § 2255 because Petitioner raised the issue on direct appeal and the Eleventh Circuit ruled against him. *See* Civ. Doc. 5 at 4–5. Alternatively, on the merits, the Government argues Detective Greene's testimony did not invade the authority of the jury, and evidence of the "illicit" text messages had been "presented to the jury long before the detective testified." *Id.* at 18.

As to cognizability, on direct appeal, Petitioner challenged the

34

admissibility of Detective Greene's testimony, arguing it constituted impermissible opinion testimony of Petitioner's mental state. *See Caniff*, 955 F.3d at 1194–95. The appellate court held Detective Greene did not offer an expert opinion but rather, as a lay witness, drew on his professional experience to reach an opinion and, even if he did offer "expert testimony," his opinion "did not expressly address [Petitioner's] mental state." *Id.* at 1195. The court reasoned:

> Detective Greene's testimony did not at all address whether [Petitioner] believed Mandy was thirteen. Detective Greene, on rebuttal, testified only that he found "evidence of illegal activity" on the phone. Indeed, he did not even say what that evidence was or whether it related at all to [Petitioner's] state of mind. "Evidence of illegality" could as easily have referred to other elements of illegality other than the mens rea element.

*Id.* at 1195–96. The court further held that even if it was error to admit Detective Greene's opinion, the error was harmless because Petitioner's counsel, not the Government, "asked the detective if there was 'illegal activity' on the phone." *Id.* at 1196.

In the absence of changed circumstances of fact or law, this Court will not reconsider an issue that was already decided adversely to him on direct appeal. *See Nyhuis*, 211 F.3d at 1343. To the extent Petitioner is merely re-casting the issue he raised on direct appeal as an ineffective-assistance-of-

counsel claim, Ground Six is not subject to attack under § 2255. *See id.* However, to the extent Petitioner's claim before this Court is different from that litigated on direct appeal, it is without merit.

As the Government notes, evidence of the text messages was "presented to the jury long before [Detective Greene] testified." *See* Civ. Doc. 5 at 18. Most of Agent Beccaccio's testimony centered around the text messages between Mandy and Petitioner. In fact, the entire text conversation, from start to finish, was read to the jury, which necessarily conveyed to the jury the Government considered the text messages themselves evidence of illegal activity. *See* Crim. Doc. 79 at 50. The jury also heard detectives arrested Petitioner immediately when he arrived at Mandy's house based solely on text messages between the two, again implicitly conveying the message that law enforcement officials involved in the operation considered the text messages themselves evidence of illegal activity. *See id.* at 87–88, 94, 171, 179, 191–93.

The question defense counsel asked of Detective Greene, with which Petitioner now takes issue, highlighted for the jury that detectives found no child pornography on Petitioner's phone, implying Petitioner was not the type of person intent on having sex with a child and which supported his defense theory that he believed he was communicating with an adult. Moreover, as the Eleventh Circuit noted, Detective Greene did not offer an opinion whether

36

Petitioner subjectively believed the person with whom he was speaking was indeed 13 or was an adult merely role-playing a 13-year-old girl. In fact, Detective Greene admitted he merely "assumed" the messages were evidence of illegal activity given he was asked to testify at trial. *See* Crim. Doc. 80 at 26.

Even if defense counsel could have phrased the question of Detective Greene better or differently, Petitioner fails to demonstrate his counsel was deficient under the highly deferential *Strickland* standard, or that, if counsel was deficient, the result of the proceeding would have been different but for the purported deficiency. Petitioner is not entitled to relief on Ground Six.

## V.  CONCLUSION

Finding Petitioner advances no argument warranting relief under 28 U.S.C. § 2255, it is hereby **ORDERED:**

1.     Petitioner's § 2555 motion (Civ. Doc. 1, Crim. Doc. 125) is **DENIED**.

2.     The **Clerk** is directed to enter judgment in favor of the United States and against Petitioner, terminate any pending motions as moot, and close the file.

3.     If Petitioner appeals this Order, **the Court denies a certificate of appealability**.[7] Because this Court has determined that a certificate of

---

[7] This Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make

appealability is not warranted, the **Clerk** shall terminate from the pending

motions report any motion to proceed on appeal as a pauper that may be filed

in this case. Such termination shall serve as a denial of the motion.

     **DONE AND ORDERED** at Jacksonville, Florida, this 31st day of May

2024.

                              BRIAN J. DAVIS
                          United States District Judge

Jax-6
c:
Counsel of Record

---

this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Upon due consideration, this Court will deny a certificate of appealability.

38